We're happy to hear argument in our second case, number 14-1244, Lewis v. Johnson & Johnson, whenever the lawyers are ready. May it please the Court. Good morning, Your Honors. My name is Adam Davis from the law firm of Wagstaff & Carmel in Kansas City. I am here representing the plaintiff, Carolyn Lewis, whose Bellwether case was tried to a directed verdict. We have raised four issues on appeal. While I am, of course, happy to discuss any of the issues that are of interest to the Court, I'm going to focus my argument on the first and the third issues in our brief, which are the sufficiency of the evidence and the summary judgment granted on our client's failure to warn claim. The first issue raises the question of whether a system that empowers juries to make important decisions should trust them to do just a little bit of thinking. The trial court erred in granting a directed verdict when five expert witnesses laid out all aspects of the plaintiff's case, including substantial testimony on the issue of specific causation. And it is important to consider in evaluating all of the evidence that, of course, on a directed verdict, all reasonable inferences must be granted to the plaintiff and causation can be proved through circumstantial evidence. These experts explained how Defendant Ethicon's TVT device was defective, how those defects caused pain for patients generally, and how those same problems were observed in the mesh that was explanted from the plaintiff, Mrs. Lewis. In addition, her treating physician, the one who did the explant of her mesh, specifically opined that the TV mesh is what was injured her, and she testified herself that her pain greatly reduced after portions of the TVT were removed. I wonder if you could point me to the expert testimony or the other evidence, which is your best evidence that a defect in the TVT caused Mrs. Lewis's pain. Well, Your Honor, there are two defects that we have identified. You understand the whole question? The defect in the TVT caused her pain? Yes, Your Honor. Okay. And part of what makes this case admittedly complex and what led to the directed verdict below is that there's no one specific expert who wraps it all up in a bow. So what we are saying is that this Court needs to take what each expert said and put that together and determine whether that was enough for a jury to make a reasonable inference as to causation. But probably the most important, if you're asking me to speak to a specific expert, Dr. Uwe Klinge, who is one of the world's renowned experts in surgical meshes, analyzed Mrs. Lewis's specific mesh in front of the jury, and he made several important observations. He noted that the mesh was full of scar tissue and that it was deformed and folded over, and this links directly to Professor Klosterhoffen, who is another mesh expert, to his general causation testimony that this is what he sees because of the fact that the mesh used in the TVT is heavyweight with small pores. So, Davis, before you get to the specifics here, let me just ask this question. Sure. Is it your position that the jury was required to make an inference because there was no direct evidence of causation in this case? No, Your Honor, I would not say that there was no direct evidence of causation. We feel that taking all of the expert testimony together provided direct evidence. But you said that the jury had to make an inference, so that suggests that there was no expert who got up there on the stand and said, this defect specifically caused your client's pain. And you earlier said that no expert wrapped it up. I'm not sure why you're running away from the term indirect. Okay, I understand, Your Honor. If you've got to draw an inference to a fact, that's indirect evidence by definition. I could agree with that, Your Honor. That there is a small inference to be made there. Well, I hope it's small. What I was saying in terms of direct evidence is that there was direct evidence as to why these products are defective and that showed the same defects existed in Mrs. Lewis's mesh. And this also leads to another concept. So, Mr. Davis, is it simply impossible to provide that level of direct evidence in cases like this such that you're always required to rely on an inference? I would never say that it was impossible, Your Honor. I think your expert tried to do that, but you would know, I guess, you've tried these cases. Is it just not feasible to get an expert on the stand to say, this particular defect in this TVT mesh caused this plaintiff's pain? Well, Your Honor, it would certainly require an unusual level of expertise. Someone would have to have the expertise in polymer science to talk about the defects of the TVT itself, as well as the medical expertise to say, well, this is what caused this defect. A biomedical engineer with an M.D.? Potentially, yes. But ultimately, that's not what we have in this case, and so the question is, is what we have sufficient? And that's why I think the Goodner case from the Fifth Circuit is so important. Because the Goodner case, whether it's characterized as direct or indirect evidence, what the court said there is that as long as you have sufficient evidence on the technical aspects of the case, such that the jury can draw a reasonable inference as the causation, you do not need that ultimate issue testimony. I don't know how that helps you in this case, given the plaintiff that you had here, who had other serious problems, who had another operation at exactly the same time, who didn't complain about this until quite long after the event. I mean, I just think that's a hard argument to make unless you have somebody that does some sort of study or something. Every time you put this in, it results in paying to a defendant or some study of some sort, or somebody who's willing to testify to that. Well, two points on there, Your Honor. First of all, the explanting physician, Dr. Zimmern, does say clearly this mesh is what caused her pain. He's unequivocal about that. Now, admittedly, he's unable to identify the specific mechanism by which it caused the pain, but his testimony is clear that the mesh is causing her pain and not those other factors that you alluded to in terms of different surgeries. Who do you say says this? Dr. Felipe Zimmern, who was the explanting physician. He testified by deposition on day five of the trial. He could not testify what characteristic of the defective or otherwise might have caused the pain, because the other part of my question was it's not just the device, but a defect in the device, right? Well, Your Honor, we actually disagree with that, too, which is a separate legal issue that ties into that. Under Texas law, there is a specific statute that says you have to connect a defect in a device in a design defect case to the injury, but that by its expressed terms, that statute also says it does not apply to medical devices and to drugs. Excuse me. So that leaves us with Texas common law. And Texas common law is admittedly a little bit unclear, but as we discussed in our brief, if you look to restatement section 402A, which is essentially what sets the common law in Texas and a lot of states on product liability, what it's saying is that the goal is where a manufacturer puts a defective product on the market, and that defective product injures someone, that the cost of that should lie with the manufacturer and not with the patient. And so that informs the common law generally. And then we also pointed to American Tobacco Company versus Grinnell, which is the only case that I think either side has found where this was actually a dispositive issue. There are a lot of cases that talk in terms of the defect or talk in terms of the product, because usually it doesn't matter. It's one and the same in these cases. But in Grinnell, what we have was a cigarette that a smoker who ended up dying from smoking cigarettes, and the family brings a cause of action and says it's the pesticide residue. It was actually a manufacturing defect claim. And the court, even though there was no expert testimony as to connecting the pesticide residue to the injury, the Fifth Circuit applying Texas law said that's not necessary. I'm sorry, this was Texas Supreme Court. My apologies. The Texas Supreme Court said that's not necessary to get past summary judgment. That basically as long as the expert can claim that the product caused the injury, that's sufficient. So what we're saying is that under Texas law, the fact that if we can prove that there's a defective product, and that issue's not up on appeal, we certainly think that we did that, and if we can prove that that defective product injured the plaintiff, that that is sufficient under Texas law. However, we also believe that if Your Honor's question accurately stated the law, and we have to connect it to a defect, we've done that. We've connected it to the heavyweight small pore mesh through the testimony of Drs. Klosterhoff and Klinga. We've also connected it to a different issue that we haven't discussed yet, but the mesh is cut with a mechanical blade, which leads to particles falling off of the mesh. Dr. Rosenzweig testified generally as to what he has seen in his practice and from his literature study with how these loose particles cause pain in patients. And then Dr. Klinga looked at the actual explant on the screen and said, here's a loose particle that is likely coming off of the mesh. So that would be another alternative explanation for her pain. So you put all of that together with Dr. Zimmern, who says, it's clear to me that the TVT is causing her pain, I just don't know why. And this case is exactly like Goodner. Because in Goodner, what you had was someone who was thrown from the car while wearing a seat belt. And the expert, what appears to be the only expert the plaintiffs had, said, this was a defect in the design of the car because the seat should not have reclined so much that she could have been thrown out while wearing her seat belt. And that increases her risk of injury to be thrown from the car instead of staying in the car. But he wasn't a doctor, so the court would not let him opine as to the cause of injury or the cause of death. Well, but causation in that case seems a lot more intuitive in the kind of inference that a jury can draw. We're talking about something which, as Judge Davis indicated, might require an expert in biomedical engineering or something along those lines. That's not something a jury can easily infer without specific evidence as to the precise defect that caused an injury. I would agree with that, Your Honor, but we have provided that specific evidence. It's just come in pieces from different experts as opposed to all coming from one expert. My point about the biomedical engineer is that's probably what you would need to get it all from one place. But we do have Dr. Klosterhoffen's testimony explaining in great detail why large or heavyweight small pore meshes are dangerous, that they cause shrinkage, that they cause scar tissue. Then we have Dr. Klinga looking at her actual mesh, explaining it from her body and saying, I'm seeing scar tissue. I'm seeing entrapped nerves. I'm seeing what causes pain in my patients. He just wasn't allowed to say, I'm seeing what caused pain in Mrs. Lewis. But he's saying, I see something that causes pain in my patients. And then we have Dr. Zimmern who's saying, yes, this device injured Mrs. Lewis. So given that the jury is allowed to rely on circumstantial evidence, given that all reasonable inferences go to the plaintiff on a directed verdict, this should have been enough to send the case to the jury. I understand that there are contrary arguments here, but the issue is simply should the jury have been able to evaluate this evidence. And with just a couple minutes left, I'd like to briefly touch on the failure to warn issue. If you don't mind, could you just take a moment and address the alternative design issue? Oh, yes. I know you didn't want to, but that's bothering me. You did proffer evidence of alternative design? We did, yes. And where is that in the record? Well, Dr. Klosterhoffen testified that there are four separate alternative designs that we proposed to the court. And first I would mention that the judge did not decide the case on that issue, and the defendants have not argued that you should decide it on that alternative basis. Right. They've said that if you remand on the causation issue that the trial court should take that issue. They did not argue, and I guess this is the answer to my question, they did not argue or did they argue at the close of your case that the alternative design issue, there was insufficient evidence to support it all. They did argue that below you, Your Honor. And the judge simply refused. The judge said I'm not, he expressly said I'm not ruling on this. It's too bad, isn't it? That depends on what he would have said. That's a good answer. Except now I'm left to answer it for myself in the first instance. Well, Your Honor, I disagree because that issue hasn't been raised on appeal. I mean, I would acknowledge. Well, it has been raised on appeal. It was part of the motion for judgment at the close of the plaintiff's case, and we can affirm on any ground appearing in the record. I agree with that generally, Your Honor, but I don't think with all due respect that the court should affirm on an alternative ground when they have not raised that as an argument to affirm on appeal. But they did raise it as an argument in making their motion for judgment. Well, but they did not raise it as an argument on appeal. They have said if you remand this issue on the causation issue, the trial court. So we didn't have the opportunity, say, in a reply brief to even address those issues. So that's why I'm saying this is different from a case where, and I see the red light is on. May I have permission to finish the answer? This is different from a situation where the appellee says here's an alternative ground that you should affirm, and then, of course, the appellant would come back on reply and have the opportunity to address those issues. Everybody agrees that the issue on appeal is specific causation. Everybody agreed to brief that issue, I think is a more accurate way to put it. But I take your point, and it's a good point. Again, my time is up. Would you like me to briefly talk about the evidence? Perhaps on rebuttal you might have something to say about it. Okay. All right, thank you, Your Honor. I broke your mic. Sorry. You know, that happened to the last appellee. I think there's something going on there. It's a design defect. Morning. My name is David Thomas. I represent Ethicon and Johnson & Johnson in this appeal for this court. Ethicon and Johnson & Johnson request that the court affirm the decision of Judge Goodwin granting summary judgment on the failure to warn claim and granting the judgment as a matter of law on the Rule 50 motion at the close of plaintiff's case. We spent a great deal of time talking during the appellant's argument about the Texas law requirement of a specific defect in this product causing a specific injury in the plaintiff in this case. And I didn't hear that. The judge didn't hear that below. And there is no evidence in this case of a specific defect causing a specific injury. Well, now, you don't argue, do you, that indirect evidence is never sufficient to prove specific causation? No, Your Honor, and the cases that we've discussed in our briefs and the cases in Texas are very clear that you can prove by circumstantial evidence, but you have to exclude evidence of other causes when you talk about circumstantial or indirect evidence. So you don't have to exclude all evidence of all possible causes, do you? You have to exclude a reasonable number of conditions or injuries that are tied with this device. And the reason why it's most important in this context, Your Honor, is this is a drug, a medical device, that is unavoidably unsafe. There is a risk of complications with this device every time it is used. And that's why doctors and patients have this conversation before they have this device or they have a pharmaceutical so that they discuss the risks, so that the doctor and the patient can make an informed decision based upon this discussion of the risks about whether the benefits outweigh the risks. Dr. Zimmern, the one witness that they have that they point to as the witness that they tie that the product to the injury in Ms. Lewis, he doesn't say that. He says, I don't know what caused it. He says the tape in the body happened at the same time as the pain. But he says there are other causes of exactly these kinds of conditions. The record's full on plaintiff's experts of other alternative causes for these types of pain. Dyspareunia, pain with sex, chronic pain, long-term pain. What explains the change in her condition or experience after explantation? But no expert made that link, Your Honor, to say that there's some defect. I understand that. But why can't the jury make that link? Because that's too big of a leap. Because that's too big of a leap in a drug or a medical device when you have so many scientific, medical, and technical issues. So then your answer is that indirect evidence is never good enough in these kinds of cases. You've got to have specific causation. You have to have specific causation. But if you have an expert who can rule out other causes of the conditions, and there are other cases. It's not in the record in this case. But there are other cases around the country where these cases get to a jury. I mean, it's happening. Okay, well, I guess I would be interested. You've spoken in such general terms. And I thought that you pointed to she had another operation at about the same time as this. And that I thought that the pain wasn't totally resolved by taking the thing out. And maybe the various problems she had working together arguably caused the pain. But I'm not sure that's the argument you're making right now. So maybe you have to reassess here what's going on. Let me address it specifically. Dr. Zimmern is not a retained expert for the plaintiffs. Dr. Zimmern is the treating physician, the explanting doctor. So he's in this case solely as giving a deposition testimony about what he experienced during his explantation and his opinions during his explantation. The retained experts on this subject, you have Dr. Rosenzweig, who does not give any opinion specific to Mrs. Lewis. You have Dr. Klosterhoffen, who is a pathologist, a pathologist. Dr. Klosterhoffen is probably in the best position to give an opinion specific to Mrs. Lewis. Dr. Klosterhoffen doesn't give an opinion specific to Mrs. Lewis. As a matter of fact, his testimony is all general in nature. Dr. Klinge, another retained expert by the plaintiffs, is a hernia surgeon. And as the court knows from the briefs that we filed and the record in this case, we fought from Daubert to the time of the directed verdict to limit his testimony to that as a hernia surgeon. And I think that you'll find as you read the record in the case that that's exactly what the judge did. The judge did not allow him to talk about pelvic floor repair, did not allow him to testify about the use of mesh in pelvic floor repair, or the complications from pelvic floor repair. Dr. Klinge was their best expert to get them where they needed to be, and he couldn't do it. They had to fall back on Dr. Zimmern as a treating physician, and Dr. Zimmern didn't get him there either. He said the TVT caused the pain, but I don't know how. This sounds like a jury argument to me. No, Your Honor, it's not. It sounds like it to me. You can't tell me it doesn't sound like it to me. I understand. I don't think that he's alone, the Lone Ranger on this. So I think what you have to do is to try to show us why it is not a jury argument. Because the Texas law requires a specific defect in the device to be tied to a specific injury. It's been the law of Texas since 1978 in the Armstrong rubber case that you have to tie the injury to the defect. And the cases cited throughout our brief shows that Texas reverses and renders cases where they can't tie a specific defect to a specific injury. The Goodner case is an exception to that because, as Justice Diaz noted, it's not hard for a jury to take a leap that if the seat is defectively designed and increases the risk of ejection, if the person is ejected from the car, that the person might die. That's Goodner. But this is different. This is a device that has inherent risks and is the subject of a discussion with the doctor before it's used about those risks so that under this theory of liability, any time a patient is injured, whether it's warned of or not, would be a jury question. And the court found as a matter of law that there was no failure to warn here that was the approximate cause of the injury because the doctor relied on her own expertise, years of experience, hundreds of these that she's implanted, and she continues to believe today, even after this, that the benefits of this device outweigh the risks. You don't take a medication. You don't use a medical device. You don't have a surgery without some risks. And to say that it's a jury question every time somebody has a complication of a surgery or a medication or a device frustrates all that there is about drugs and medical devices that are so heavily regulated. I don't think anybody's saying every time. You prove too much. Well, I would suggest to you, Your Honor, that to allow this case without any experts saying that one of these defects that they claim they've identified caused her injury, that means that every one of these cases is a jury case. You were halfway through a jury trial. That's kind of what's hustling here. But didn't you folks spend five days in front of Judge Goodwin? Yes, Your Honor, we did. And Judge Goodwin was there. Have you ever made your motion and said, Judge, we don't mind if you reserve? I mean, you had your witnesses all lined up. You were ready to go, right? But, Your Honor, it's just difficult for these cases to come up to us. This is just me talking. You spend all that money on discovery. You spend all that money and time putting on a plaintiff's case. And then the judge takes the case away from the jury when you may well have won this case with another three days of trial. May very well have, Your Honor. I think I will. But now I'm here. I'm here as a judge. And I'm thinking of the Seventh Amendment. And I'm looking at a record in a very complicated, complex area. And, you know, I think juries have common sense. And I think it's a great argument you're making. The thing is inherently dangerous, or at least risky. I agree with you clearly. So why not let juries make those decisions? That's why we have juries. That's why we have Seventh Amendment. That's why we rely on the mature judgment of the people. I would suggest to you that Judge Goodwin was very interested in having a jury decide this case. Judge Goodwin, throughout Dr. Klingin's testimony, really tried to help the plaintiff lay the foundation for the appropriate expertise for Dr. Klingin. I don't think he was trying to help the plaintiff. Well, he says it directly. I'm trying to help you here, Mr. Anderson. It says so in the transcript. That's a colloquial term. Well, excuse me. Well, used in West Virginia. We do things differently there. You're right, Your Honor. But the fact of the matter, this is very important, is Texas law is very specific about what it requires. It does require the link of specific defect to an injury or to a cause. And we don't have that here. This is a piece of multi-district litigation, right? Yes, Your Honor, it is. And have all the cases been consolidated in front of Judge Goodwin? The federal cases have, Your Honor. And so when we talked about, when your colleague talked about going to a jury trial, those were state cases? Is that it? We had a second trial in August where we had a plaintiff's verdict in another TBT case. So Judge Goodwin has let other cases go to trial? Yes, Your Honor, he has. Or at least one other. With another plaintiff? That was an Illinois plaintiff, an Illinois case. But yes, Your Honor, and there have been other cases for other defendants. So Texas law wasn't an issue there? Correct. Correct. And that's important. Texas law is very specific about what it requires. And Texas law, all the cases we've cited to the court, and read in conjunction with the comment K, unavoidably unsafe products, you have to have a specific defect with a specific injury. Or when you have a horrible outcome, you're going to have juries speculating or being swayed by prejudice or sympathy and awarding verdicts that aren't tied to a defect in the case. Mr. Thomas, you started off your argument by suggesting that this product is unavoidably unsafe but does have some benefits sufficient to justify its use. Does that suggest that Judge Davis' point about there being no safer alternative might be a way to resolve this case? We have certainly briefed that they are required to prove a safer alternative design. The evidence that they offered below was evidence from Dr. Klosterhoffen of a mesh made out of a different material. But it hadn't been designed, it hadn't been finalized, and hadn't been in a situation that it was available in the United States for use. So our position below was there was no reasonable alternative design available in the United States as a replacement for this device. But it is in use in Europe, correct? Yes, it is. And remember, this device, this is in the record in the case, is recognized as the gold standard for the treatment of this condition by all of the major medical societies in the United States and around the world. Even plaintiff's experts recognize that this is the best treatment there is in the world for this kind of condition. And the problem that you have is when you have a bad outcome or you have some pain associated with a surgery, you can't then make it a jury question without a defect in the product tied to an injury. When you said treatment just now, did you really mean device? You said this is the best, all the experts agree this is the gold standard of treatment. The device is used to treat stress urinary incontinence. Right. And you place the tape underneath the urethra in order to arrest the flow of urine in stress urinary incontinence. So are you using the terms device and treatment interchangeably now? I don't want to get too deep in the weeds. Let me just explain. Prior to this device, stress urinary incontinence was treated with lengthy surgeries, abdominal surgeries that sometimes took days. The use of mesh to treat stress urinary incontinence can now be done in 30 minutes on an outpatient basis. Is this the only one on the market in the U.S.? No, there are multiple manufacturers of these kinds of meshes. Johnson & Johnson makes, I believe, about five different brands of meshes to treat stress urinary incontinence. There are a number of other defendants. There's also a whole other class of devices that are part of the MDL for the treatment of another condition called pelvic organ prolapse. That's a very different condition than what we have here. But the mesh, again, it's worth repeating because it's very important. Doctors the world over recognize that this TVT device is the gold standard for the treatment of stress urinary incontinence. Everyone recognizes that the benefits of this device outweigh its risks and that in appropriate patients, this is how you treat this condition. So their treatment for this is surgery or a device, this device? Or there's not like get a good diet and exercise and we'll see what happens? No, Your Honor, there is. So that's another treatment? I think it's fair to say that doctors, as they do other things, do conservative treatments first. Right. Until you can't manage it. I mean, it's anywhere from drugs, exercises, pads, whatever you need until you can't stand it anymore is what it amounts to. And so this, when it was introduced in 1998, it was a revolution. And it's very clear in the record that this revolutionized the way doctors treated women with this condition. And as a result of Ethicon bringing this product onto the market, others joined in and now it's very widely used all around the world. So getting back again, that's why every surgery has risks. Every product used in this kind of circumstance has risks. That's why doctors have a conversation with their patient before they use it to inform them of these risks so they can decide whether to have the surgery, knowing that they may have dyspronia, knowing they may have chronic pain, knowing they may have to have reoperations, knowing they may have to have other issues that doesn't work out well for them. That happens. But that does not make it a jury question, Your Honor, about when a mesh is in place in a woman and she has a bad outcome, all of a sudden it's the mesh's fault, unless and until a plaintiff can identify a specific defect resulting in a specific harm. Because without that, the jury's left to speculate. Well, was it the large pores or small pores? Was it the heavyweight mesh? Was it this roping, curling, and fraying? Was it this particle loss? Any, all of them, none of them? Because dyspronia and chronic pain happen without the mesh. There was no effort to exclude these alternative causes at the time. And absent any effort to exclude, there's no, there's not enough indirect evidence for this to be a jury question. Now, when you read Dr. Klinga's examination and the exceptions and the sidebars, plaintiffs try mightily to qualify him as an expert who can talk about pelvic floor repair. He's a hernia surgeon. He's not a pathologist. He can't sign pathology reports in his own hospital. Yet he was being asked to interpret pathology slides. And the judge gave him considerable latitude and let him do that. And even let him try to answer a question which he couldn't answer. And at that point, the court, I think appropriately, found that as a matter of law, they had not sustained their burden. And this is not a situation where the judge cut them off. This is a situation where the plaintiff stopped. Because in the record also, at the close of the evidence and during the time of the motions directed verdict, the judge makes it very clear that he never stopped them from asking any questions. They quit. And they decided they got everything they could get out of Dr. Klinga they were going to get. And the point is, Your Honor, he had to brief twice. This was not a hasty decision. He requested briefs on a Friday and then on a Sunday night. He thought about this a lot and looked at it very, very carefully before he decided that judgment as a matter of law was appropriate. He wanted to get it right. And I suggest to you that he did. There are other points in the papers. The alternative design, I think it's very clear that Texas law has required an alternative design since the Caterpillar case. And drug and medical device cases in Texas have required alternative designs in both state and federal court since that time. And to the extent that the court is interested at all in the argument that this statute exempts drug and medical devices from the statute, it's pretty clear that the statute says this doesn't affect anything that the common law says. And Texas courts, both state and federal, have applied the alternative design case to drug and medical device cases throughout the history of these cases. Can I ask you this? How do you account for the fact that the judge denied summary judgment to your client and then granted the motion for judgment? Now, that's a very simplistic question, but I'm curious to know your answer to it. Well, he granted summary judgment on the failure to work claim. Yeah, he granted summary judgment on a number of claims. My judgment is that he wanted to see what the evidence was going to be at trial on specific defect causing specific injury. In the Daubert motions, we litigated the Daubert motions very aggressively. Plaintiffs made some representations about what the evidence was going to be. The evidence came in differently than was represented in the Daubert motions. Can you give us a quick summary of what difference there was between the representation and the trial testimony? Two of the principal witnesses were Drs. Kling and Klosterhoffen. Dr. Klosterhoffen is a pathologist. Dr. Kling is a hernia surgeon. They're the two people who are most closely associated with these meshes. Right. And Dr. Klosterhoffen testified only about general causation. What was promised and what was given is what we're interested in. There were promises of specific causation that weren't delivered as a practical matter. This didn't happen. In opposing the motion for summary judgment, they said they were going to have evidence of specific causation. That's correct, and alternative design. And when you say that, I guess we want it just a tad more detailed than that. In other words, they said Dr. Kling is going to testify, blah, blah. Well, Dr. Kling's report didn't have a specific causation. Exactly. As a matter of fact, in a footnote, he says, I'm not going to address it. So I know your argument. So that wasn't promised. But I'm asking what their promise is. Well, their promise, obviously, is that we can prove specific causation. I know, but how did they think they were going to promise it? I understood it was through Dr. Rosenbach and the combination of witnesses that you've heard about, through a combination of witnesses as opposed to a specific witness. So they delivered exactly what they promised. But it's not enough. A combination. But it wasn't enough.  But judge. You said that they, we were asking why the district court didn't grant you summary judgment. And you said because at that point, the plaintiffs were promising something that they didn't deliver at trial. And that's the thing we're trying to get at. I understand, Your Honor. Not your argument about why it's wrong or whatever they did was wrong. And I apologize. But what they promised and what they didn't deliver. As I remember the wording of the summary judgment order denying on specific defect, the court made the point at that time that the evidence was sufficient to be considered by a jury. I can't tell you specifics. I just don't remember. What I'm asking you is what did they promise? That they could tie a defect to an injury. And granted, they also have made the argument today, and they made it then, that they don't have to prove specific defect. That they can do the general defects and have the jury make the inference. So they don't agree, didn't agree then, don't agree now, that they have to prove specific defect causing injury. And thank you. I ask that the court affirm the decision of Judge Goodwin. He's got a lot of these cases, and he is in the best position, I think, to know what it is he's looking at. Thanks very much. May it please the court. I'll see how much ground I can cover in five minutes here. I'd first just like to go back to one comment by Judge Davis about it being a jury argument. And I think when you heard the argument about the TVT supposedly being the gold standard, that's exactly what that is. That's a jury argument. That has nothing to do with whether our evidence was sufficient. So I'd just like to remind the court that is the key issue here. Could you answer that last question? From your perspective, what did you promise at summary judgment that, apparently from the perspective of the district judge, you didn't deliver? The best answer I can give you, Your Honor, is I don't know. I don't feel like... You feel like you gave them everything you promised. So if we find something that you promised that you didn't deliver, I mean, this would be a good time to address that. That's all I'm suggesting to you. That's the best answer I can give you, Your Honor. Did you always know it was a circumstantial case? It's hard for me to answer. Do you agree it's a circumstantial case? Not entirely, because as Mr. Thomas said, we've always felt like that if we could tie... if we could prove that the product was defective and prove that the defective product injured the defendant, that that would be sufficient under Texas law. How do you do that with a hernia surgeon? Well, it wasn't only a hernia surgeon, but Dr. Klinga... I mean, certainly... First of all, I mean, during the trial, and if you look at the testimony from day four, there's about 20 to 30 pages of testimony of Mr. Anderson, the attorney trying the case, qualifying him, because Judge Goodwin didn't just say, Okay, I'm going to let you talk about this. He said, All right, if you think he can talk about this, you're going to have to prove to me that you can. And some of the things that Dr. Klinga talked about are that he and Dr. Klosterhoffen are basically the two people in the world who have spent the last 20 years looking at surgical meshes. He has personally looked at over 20,000 histopathology slides. He testified that he has written articles, over 200 articles on these issues, and he estimated that about 50 of them, he looked at the slides only himself for those articles. On some of them, he got help from others, including Dr. Klosterhoffen, who is a pathologist. He talked on the stand about how he sees the same reactions, whether it's in the pelvic floor, whether it's in animals, or whether it's in the abdominal wall. So, I mean, that testimony was there, and the judge allowed it, and I don't think that there's really an argument that Judge Goodwin abused his discretion in allowing that testimony. There's an issue about other testimony that we wanted to get in that I haven't really addressed today. But as far as what was in, the court should credit that testimony. And Dr. Klinga very specifically looked at those pathology slides, which he is highly qualified to do, and said, I am seeing shrinkage. I am seeing scar tissue. I am seeing entrapped nerves. I am seeing loose particles. This is what he's seeing in Mrs. Lewis's specific explant. And that goes back to the whole issue of their argument is, well, the Goodner case is different because it's a more intuitive inference that somebody's thrown from the car and they're likely to die. And that may be true that it's a bit of a simpler case, but our argument is that we gave the jury everything that they needed to get to where the inference is the same level of inference, plus we gave them something that wasn't in Goodner, which is the treating physician saying this product caused her injuries. And he said it wasn't a hard diagnosis to make. On the issue, Judge Davis, I just have a minute, so I'm going to try to be really quick. But you did ask about alternative designs, and I'll just quickly run through the four arguments that we have. I don't think you need to do that. Okay, all right. All right. Thank you. I think you made another important point in saying that juries do have common sense. And I think that's ultimately what our argument comes down to. We provided all of the technical information that the jury needed to make this decision. However you interpret Texas law, whether we needed to relate it to a specific defect or just to the product generally, we showed why the product is defective. We showed that the small pores cause fibrotic bridging, scarring, deformation of the mesh, which leads to entrapped nerves and pain. We showed that in Mrs. Lewis' explant. We explained how Ethicon's own people recognized that mechanically cutting the mesh causes fraying, causes particles to come off. Dr. Rosenzweig testified he's seen that cause pain in his own patients. And then we see Dr. Klinge sees that in this mesh, those loose particles. Mr. Thomas indicated that you hadn't presented testimony excluding other causes, but I suppose you're relying on the treating physician's testimony that said it was the mesh that caused her pain and nothing else? I'm at the red light. May I have permission to answer, Your Honor? Yes, that's part of it. I think it's two things. I think specifically we have the treating physician saying this is what was causing her pain. He even identified the spot. He said it was under the urethra. I could tell that that's the part of the tape that was causing her pain, so that's what I took out. Then we have, as Judge Davis recognized, we have evidence from her about this changed her life once this was taken out. And then I think when you look at all the specific evidence that Dr. Klinge identified, when he's saying, okay, it's this, it's this, it's this, and it's this, that's also inherently excluding other causes. If we uphold this, does that shut down Texas law on these claims for everybody? It would make it pretty much impossible to have a design defect claim regarding a medical device. Because this is your best case, right? Well, some cases have. I never was able to really get to the failure to warn issue, which we do think should be revived. But I guess I would disagree with that because a best case. You think you've got a better case under Texas law out there? A better case under Texas law would have a clear failure to warn claim where the treating physician says, yes, I relied on these warnings. And if there had been different warnings, I wouldn't have recommended this device. Okay, but this is your best design defect case under Texas law. You're not even saying that. There are 50,000 cases, Your Honor, and I simply couldn't answer that question. Fair enough. Any other questions? Thank you very much. We will come down and greet the lawyers and then go directly to our next case. Thank you, Your Honor.
judges: Diana Gribbon Motz, Albert Diaz, Andre M. Davis